UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Crystal Diamond Herman | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 50298 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Crystal Diamond Herman brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits. She is proceeding *pro se* in this Court, although she was represented by counsel at the administrative level.

## BACKGROUND

On November 16, 2012, plaintiff filed her disability applications, claiming that she was disabled because of kidney problems, lupus, and asthma. R. 222. On January 29, 2015, a hearing was held before an administrative law judge ("ALJ"). Plaintiff was represented by counsel who submitted a pre-hearing brief. Ex. 17E. Plaintiff testified that she was currently living with her mother and stepfather. Her mother worked full-time and her stepfather was receiving disability payments. Plaintiff was receiving food stamps. She stated that she did not drive during an average week. The ALJ pointed out that plaintiff had gotten into a car accident "just a couple of weeks" before the hearing, and plaintiff responded that she had driven that "one time." R. 37.

The ALJ asked plaintiff why she selected an onset date in 2010, but then stated on another form (Ex. 5E) that she was babysitting through 2013. Plaintiff answered as follows: "I

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

think it was my meds that I was on. I lost memory, because I think it's 2010 that I stopped babysitting now instead of 2011 or whatever date it was." R. 38. Plaintiff stated that she quit babysitting because it was "getting too hard." *Id.* The ALJ asked about several earlier jobs, including work at a pharmaceutical company where plaintiff worked as an assembly and machine operator. Plaintiff stated that she could not currently work because she was "going through some mental health issues" and was "not equipped right now to deal with people." R. 41.

The ALJ asked plaintiff about treatment for her mental health issues, noting that the timing was a little suspicious that plaintiff entered a partial hospitalization program for bipolar disorder just two weeks before the hearing in January 2015, but then did not seek similar treatment in July 2013 when a doctor advised her to do so. R. 41. Plaintiff stated that she "just found out that [she] was bipolar from [her] new doctor" and stated that the earlier doctor never told her to seek treatment and also that she did not have insurance then. R. 41-42.

The ALJ asked plaintiff about her marijuana use. Because this issue was mentioned in the ALJ's decision and is part of plaintiff's arguments here, the Court will quote the following exchange, which sets forth the ALJ's concerns alongside plaintiff's responses:

> Q  When you were in the hospital two weeks ago, you tested positive for marijuana again, as you have on several occasions in the past. So, how frequently are you smoking marijuana at this time?

> A  At this time, I'm not smoking it anymore. I was smoking it [] due to my appetite. I lost 20 pounds I think in a month and a half. My doctor knew about it, and I was just trying to get an appetite. That's only why that I used that drug.

> Q  Okay. I mean you're overweight. You're still in the obese, mildly obese category. So, I mean what's the concern with the weight? I don't get that. And your doctor did tell you to stop smoking marijuana. So, why have you been doing it?

> A  Well, I was doing—I had—for my weight.  I was—I had lost like 20 pounds in a month and a half.

2

       Q  Your doctor told you to stop though. So, why didn't you follow your doctor's recommendations?

       A  I have, but she said it's going to take so long to get out of my system. She told me that when she left in December. But she said it's going to take awhile for it to get out of my system, since it's been in my system for awhile.

R. 42-43.

The ALJ asked plaintiff whether she had gone to physical therapy after her recent car accident. Plaintiff stated that she had gone one time, but was waiting first to finish the partial hospitalization program and was doing home exercises. The hospitalization program lasted two weeks. Plaintiff was referred to counseling after that program.

The ALJ asked plaintiff when she last saw a rheumatologist. Plaintiff stated that she saw one in July and had an appointment with another one coming up in February. She that that it "was a problem with [her] insurance" and that she "just [] received [her] Obamacare." R. 45. The rheumatologist who plaintiff saw in June, Dr. Hovis, told plaintiff that her lupus was in remission. R. 46. Plaintiff stated that she got insurance under the Affordable Care Act starting on December 1, 2014. The ALJ noted that the medical records appeared to show that, throughout this period, plaintiff's lupus was either stable or in remission with no significant exacerbations. Plaintiff agreed, except she added that she had one exacerbation three years ago. R. 47.

The ALJ asked about plaintiff's right shoulder. Plaintiff again cited the lack of insurance, but stated that she was referred to physical therapy. The ALJ asked plaintiff whether she was still smoking. Plaintiff stated that she was smoking half a pack of cigarettes a day. The ALJ asked plaintiff what triggered the suicidal thoughts she experienced a few weeks ago. Plaintiff stated that she was put on a new medication in the hospitalization program.

As for pain, plaintiff stated that her back and joints bothered her the most. She also had pain in her hands, which would lock up if she tried to peel a potato or comb her hair. R. 50. The

ALJ asked plaintiff whether she was taking any pain medication for these problems. Plaintiff answered that her doctors recommended a heating pad and that her mother had given her a rub called Icy Hot. The ALJ asked whether plaintiff had used any over-the-counter pain medications such as Tylenol or Ibuprofen. She answered that had not used any of these medications. R. 52.

The ALJ asked about plaintiff's depression. She stated that "everything is like to the tenth power" and that she was unable to control herself. R. 52. She was learning in class "how to breathe and calm [herself] down." *Id.* She did not get into any physical alterations, but had gotten into verbal altercations. She described an incident with another customer in a McDonald's parking lot. She still had crying spells on occasions. She had insomnia as a side effect of her current medication. She can only walk a block because of her asthma. She can stand for 10 to 15 minutes at a time and sit for about 30 minutes. R. 56. She can lift a gallon of milk with her left hand, but less with her right hand because of the right shoulder problem. On a typical day, she will "[l]ay in bed all day." R. 57. She did not cook, wash the dishes, clean around the house, or do her own laundry. Her mother performed these tasks for her.

Plaintiff's counsel then asked questions. Plaintiff testified that she had never lost any job because of verbal altercations with other people. R. 61. Counsel asked plaintiff whether she was hearing voices when she started new medication recently, but plaintiff answered no, although she stated that she sometimes heard voices now. R. 62. Counsel asked when that happened, and plaintiff stated "yesterday" she heard a voice that "told [her] to cut [her] wrists." *Id.* Plaintiff was unable to finish tasks or focus on things like she used to do. Plaintiff stated that she used an electric cart when she went grocery shopping with her mother. She left her house once or twice a week on average. She sometimes got in verbal altercations with others when she went to church. She stated that she bathed every two to three days. R. 65.

On February 23, 2015, the ALJ issued a 14-page decision finding plaintiff not disabled. The ALJ found that plaintiff had the following severe impairments: "[lupus]; right shoulder tendinosis, tendinitis and partial tear; asthma, with continued tobacco abuse; obesity; and depression vs. bipolar disorder." R. 16. The ALJ found that plaintiff did not meet any listings, specifically, listing 14.02 (lupus), 1.02 (right shoulder problems), 3.03 (asthma), and 12.04, 12.06, and 12.09 (mental health listings). The ALJ acknowledged that plaintiff's obesity (she weighed 230 pounds) complicated other problems. In the residual functional capacity ("RFC") analysis, the ALJ found that plaintiff could do light work subject to certain restrictions, such as a limitation on reaching with her right arm and a limitation on contact with the public and co-workers. The ALJ found that plaintiff lacked credibility because, among other things, she had failed to seek treatment when advised to do so and her doctors had not found her to be suffering from severe symptoms. In particular, doctors repeatedly stated that her lupus was in remission. The ALJ noted that plaintiff continued to smoke cigarettes and marijuana even though doctors advised her to stop. The ALJ noted that no doctor provided an opinion that plaintiff was limited beyond the limitations found by the ALJ, which were incorporated into the RFC. Finally, the State agency physicians had rendered opinions consistent with the ruling.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by

reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Plaintiff has filed the following handwritten documents: (i) a one-page complaint, which has attached the 3-page ruling by the Appeals Council, dated July 28, 2016 (Dkt. #1); (ii) a completed in forma pauperis application and financial affidavit (Dkt. #3); (iii) a two-page opening brief dated April 10, 2017 (Dkt. #9); (iv) a two-page reply brief dated July 13, 2017, which includes 14 pages of miscellaneous records (Dkt. #15); and (v) a second reply brief, which is four pages and is dated July 17, 2017 (Dkt. #16). In filing these multiple documents, plaintiff has exhibited diligence and focus.

Although fairly short individually, these documents collectively contain a number of disparate assertions. The best way to begin is to catalogue them. In her complaint, plaintiff complained that the ALJ told her "to get more medical evaluation," but then had not given her "a chance" to present these records, and that plaintiff had been waiting for 14 months for her to do so. Dkt. #1 at 1. Plaintiff stated that "things have changed" since she saw the ALJ and that her "health hasn't gotten any better," and that she "has doctor[] records to prove this." *Id.* Plaintiff criticized the ALJ because she "broke [plaintiff] down in the courtroom." *Id.*

In her opening brief, plaintiff described her dire financial condition, stating that she has zero income and that the Township has been paying her rent for almost two years and that she was worried that she might become homeless if she did not receive disability benefits.[2] Dkt. #9 at 1. She stated that she is "on a cane, bathchair, and need[s] knee replacement." *Id.* She "just got [her] thyroid removed [on] Feb 27" and had her right rotator cuff repaired. *Id.* She has "paperwork" from doctors stating that they do not think she can work. *Id.*

In her first reply, plaintiff complained that the ALJ made a factual error when stating that plaintiff smoked five packs of cigarettes a day. Dkt. # 15 at 1. Plaintiff agreed that her lupus was still in remission, but stated that "lupus attacks different organs in her body." *Id.* She stated that she was getting a cortisone injection in her right leg. *Id.* She stated, as she had done at the hearing, that she smoked marijuana because she thought it would help her gain weight. *Id.* Plaintiff stated that she has "new records" to show that she goes to the doctor "often" and stated that at the time of the hearing she had no insurance. She stated that Dr. Andrew Jasek told her "that [her] right side is messed up" and asked her whether she plays sports. *Id.* She was on 12 medications. Plaintiff stated that another doctor, Rose Stocker, stated that plaintiff could not work. *Id.* at 2. Dr. Stocker had been her doctor for two years. *Id.* Plaintiff stated that "the Judge and [her] lawyer gave up" on her. *Id.* To prove these and other points, plaintiff attached 14 pages of records to this brief. (These are discussed in more detail below.)

In her second reply brief, plaintiff stated that the ALJ told her, at the hearing, told "to get [her] shoulder checked" and that she subsequently had surgery on her right rotator cuff. Dkt. #16 at 1. Plaintiff complained again about the alleged error in the amount of cigarettes she smoked. Plaintiff stated that her doctors never stopped giving her pain medication because she tested

---

[2] At the hearing, plaintiff stated that she was living with her mother who was taking care of her by doing all the shopping, cooking, cleaning, and laundry. It appears, based on rent payments from the Township, that plaintiff has since moved out of her mother's home and is living in her own apartment.

positive for marijuana, and she again insisted that her doctor told her she was "losing a lot of weight." *Id.* Plaintiff complained that she "did what [the Social Security Agency] to [her to do," which included undergoing various tests and examinations. *Id.* at 2. Finally, she stated that she felt like her lawyer and the ALJ misled her and that she was worried about being homeless.

Although plaintiff has passionately argued her case, the Court does not find that these arguments, either individually or collectively, warrant a remand. Many of her assertions are only vague complaints that are either insufficiently developed or lack a supporting legal theory. For example, although the Court sympathizes with plaintiff's understandable worries about her financial situation, this Court is not permitted to remand a case based on such an argument. Similarly, plaintiff's general but vague sense of disappointment with the role played by the Social Security Administration, the ALJ, and her own counsel is not a ground for reversing the ALJ's decision. Plaintiff has not provided any specific examples to suggest that her attorney performed poorly, and in reviewing the record, this Court has not found any reason to believe counsel did not vigorously present her case. As for the Social Security Administration, plaintiff seems to believe that, as long as she complied with various requests for examinations, then she was then automatically entitled to receive disability benefits. This is a misunderstanding of this process. In every case, the Administration has a duty to investigate the claim and develop the record. As for the ALJ's role, plaintiff suggested that she was treated unfairly. But after reviewing the transcript, the Court can find no evidence that the ALJ engaged in any improper questioning in a way that was different from the typical case. It is true that the ALJ questioned plaintiff about possible inconsistencies and suspicious assertions, but such an inquiry is part of the ALJ's job. In sum, the above arguments do not provide a basis for remand. *See Woods v. Colvin*, 2015 WL 9076997, *2 (N.D. Ind. Dec. 16, 2015) (although briefs written by *pro se*

plaintiffs are held to a less stringent standard than those written by lawyers, "perfunctory and undeveloped arguments—even those presented by *pro se* plaintiffs—are considered waived")

Plaintiff's main argument appears to be that she has new evidence that might change the ALJ's mind. She has described recent medical procedures, such as a thyroid surgery, and has provided documents from several new doctors, such as Dr. Jasek and Dr. Stoker. But unfortunately for plaintiff, this evidence suffers from several problems. First, there is no explanation connecting these facts and documents to either plaintiff's specific conditions or the ALJ's analysis. The fact that plaintiff had thyroid surgery may be indicative of serious ongoing problems or it may be an issue that was successfully addressed through surgery. Other pieces of information are similarly vague. There is a page listing medications plaintiff was taking. *See* Dkt. #15 at 3. But plaintiff did not explain what is significant about these medications, or whether they were different from those when the ALJ reviewed the evidence. Plaintiff has included several documents indicating that she had upcoming doctor appointments, such as a September 25, 2017 appointment with Dr. Jasek and a September 11, 2017 appointed with Dr. Sravanthi Nagavalli, who works in the endocrinology department. *Id.* at 4, 9. However, aside from this basic information, plaintiff has not explained why these appointments are relevant. Plaintiff has attached a delivery ticket, dated June 1, 2017, for a cane, and another delivery ticket, dated April 17, 2017, for a bath seat and shower grab bar. *Id.* at 7-8. Related to the latter, plaintiff has attached a one-paragraph letter, dated April 10, 2017, from Liam Wolf at Rosecrance to Dr. Stoker stating as follows: "Crystal and I have been discussing her physical challenge getting in and out of the bathtub safely. I am wondering if you may be able to write her a prescription that would aid in her getting a bath support chair and bar rails installed?" *Id.* at 10. Again, there is no discussion of why this evidence is inconsistent with the ALJ's decision. It is possible that there is

a connection, but it is not this Court's role to speculate about these connections. Finally, plaintiff has attached six Rockford Township forms entitled "Attending Physician's Statement." *Id.* at 11-16. Some of these are signed by Dr. Stocker, some by nurses, and some by other doctors. They offer various diagnoses for why plaintiff cannot work, with Dr. Stocker stating that it was because of the lupus, and the nurses stating that it was the bipolar disorder. Although these statements are more direct than some of the other pieces of evidence, there is still little basis for understanding why these doctors and nurses reached these conclusions.

Second, the larger problem with this evidence is that it all relates to plaintiff's condition well after the ALJ issued her decision in early 2015. Plaintiff has not made any argument that this later evidence somehow sheds light on her earlier condition. For this reason, this Court cannot rely on this evidence to overturn the ALJ's decision. *See Slayton v. Colvin*, 629 Fed. Appx. 764, 771 (7th Cir. 2015) ("Medical records that were not available to the ALJ cannot be used to determine the correctness of the ALJ's decision"); *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008) ("Medical evidence postdating the ALJ's decision, unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement."); *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004) (same). As described above, plaintiff is relying on a thyroid surgery in 2017, and several doctor appointments in 2017—all two years after the ALJ's decision. As for the Rockford Township forms, the earliest is December 2015, but most of the others are in 2016 and 2017. Plaintiff stated that she needs a bath chair and a cane, but the request to her doctor asking for approval for these items was made on April 10, 2017, the same day that plaintiff filed her opening brief in this case. One of the reasons cited by the ALJ for finding plaintiff not credible was that she suspiciously sought treatment only right before her

administrative hearing. *See* R. 20. In short, this newly-submitted evidence concerns the state of

plaintiff's medical condition primarily in 2017.

Plaintiff has raised two assertions that specifically address evidence or arguments

considered by the ALJ. The first is plaintiff's assertion that her doctors never stopped giving her

pain medication because she tested positive for marijuana. Plaintiff seems to be suggesting that

the ALJ misstated the record somehow, but the Court does not find any error in the ALJ's

statements. For example, the ALJ stated that, on September 4, 2014, Dr. Patel stated that she

"would not prescribe Norco for pain because [plaintiff] had tested positive for marijuana." R 21

(citing Ex. 6F at 10-11). In checking the source document relied on by the ALJ, the Court finds

that it provides authority for the ALJ's statement. *See* R. 385 ("I will not be able to prescribe

norco for this Pt. since she tested positive for marijuana on her last uds."). The ALJ also noted

that Dr. Hofmeister, on September 16, 2014, told plaintiff that she "would not be able to get pain

medication from other providers at Crusader if she was actively smoking marijuana." R. 21

(citing Ex. 6F at 8-9). Once again, the source material provides support for the ALJ's statement.

*See* R. 382 (advising plaintiff that she "will not be able to obtain pain medication from other

providers at [Crusader] if she is actively smoking THC"). More broadly on the issue of plaintiff's

habitual marijuana use, which she has not denied, the ALJ found that plaintiff's explanation—

that she was only taking the drug to increase her appetite—was not believable in light of

plaintiff's obesity and her various weights over a multi-year period. This Court has previously

quoted from the exchange at the administrative hearing on this issue, and the Court cannot find a

basis now for concluding that the ALJ's credibility assessment was wrong. *Minnick v. Colvin*,

775 F.3d 929, 937 (7th Cir. 2015) (an ALJ's credibility determination should be reversed only if

it is "patently wrong").

Plaintiff's second argument concerns the number of cigarettes she was smoking at one point in time. Specifically, plaintiff believes the ALJ made a factual error in stating that she told Dr. Hovis, at a June 2014 visit, that she was "smoking five *packs* of cigarettes a day." R. 20 (emphasis added); Dkt. #16 at 1 ("Nowhere in my records states that I smoke 5 pack of cigs, can't even afford them, with no income, it[] might have stated 5 cigs a day."). Plaintiff is thus arguing that the ALJ made a factual error. In one limited sense, plaintiff may have raised a valid point, but it is still not a ground for a remand. As for the claim that she told Dr. Hovis that she was smoking five packs of cigarettes a day, the ALJ accurately quoted Dr. Hovis's notes. *See* R. 404 ("Crystal reports that she has been smoking Cigarettes. She has been smoking about 5.00 packs per day."). So, if there were any error, it was originally made by Dr. Hovis, not the ALJ. Thus, the ALJ's statement in the decision is not strictly inaccurate. It seems that what plaintiff is really arguing is that the ALJ should have recognized that this was a mistake given plaintiff's other statements about her cigarette usage, which were more in line with five cigarettes (and not five packs of cigarettes) a day. But even if the ALJ were obligated to doubt this one statement, any such error was harmless because the ALJ merely described this fact in the middle of a long narrative summary, and there is no evidence that the ALJ placed great weight on it. Moreover, the larger point that plaintiff's doctors advised her to quit smoking in light of her asthma problems still finds support in the record. *See* R. 19, 20. Finally, other facts in the record suggest that plaintiff was not always consistent in answering questions about how much she smoked. *See, e.g.* R. 20 (plaintiff told emergency room doctors "that she had never smoked"); R. 452.

Perhaps plaintiff's strongest argument is her claim that she lacked insurance and that this is why she did not follow through with some treatments. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to

show that a condition was not serious without exploring why the treatment history was thin"). But here, the ALJ asked about this issue at the hearing, and plaintiff stated that she was eventually able to get insurance in late 2014. In summarizing the evidence, the ALJ noted plaintiff's statements about her lack of insurance. R. 19, 23. Finally, a number of the ALJ's rationales were not based on the lack of treatment. For example, the ALJ noted that the various doctors that plaintiff was able to see, despite her insurance problems, stated consistently that her lupus was in remission. Similarly, the ALJ noted that plaintiff claimed to have significant back pain, but then did not even take any over-the-counter medications. R. 23.

For all the above reasons, the Court is not persuaded that a remand is justified based on plaintiff's arguments. It should be noted that, although plaintiff is now proceeding *pro se*, she was represented by counsel at the administrative hearing. Counsel not only appeared at the hearing to represent plaintiff but, as noted above, filed a pre-hearing brief. Given this fact, this Court must assume that plaintiff's best case was presented to the ALJ. *Skinner v. Astrue,* 478 F.3d 836, 842 (7th Cir. 2007) ("a claimant represented by counsel is presumed to have made his best case before the ALJ"). So this case is different from one where a party never had the benefit of any advice of counsel. In her briefs, plaintiff has asked this Court to review the record and find that she is disabled, but it is not this Court's job to "construct a party's argument for [her]," and this holds true even when that party is proceeding *pro se. Woods v. Colvin*, 2015 WL 9076997, *2 (N.D. Ind. Dec. 16, 2015) (*quoting Small v. Endicott*, 998 F.2d 411, 417 (7th Cir. 1993)).

## CONCLUSION

For these reasons, the Court recommends that plaintiff's motion for summary judgment be denied, that the government's motion be granted, and that the decision of the ALJ be

affirmed. Any objections to this Magistrate Judge's Report and Recommendation must be filed with the District Court Judge by March 5, 2018. Failure to file objections by this date shall constitute waiver of subsequent review absent a showing of good cause for such failure. *See Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260 (7th Cir. 1989).

Date:  February 23, 2018                By:  _____
                                             Iain D. Johnston
                                             United States Magistrate Judge

14